George Members assistant press secretary for traces of the United States V. Gilman. Before we begin, let me just say we have this counselor on on zoom and just wanted to make sure you can hear us and that we can hear you. Thank you, Your Honor. I can hear you. Can you hear me? Yes, I think we're ready. Thank you, Your Honor. Good morning. May it please the court. My name is Joseph Hamsel and I represent Mr. Gillen in this case. Mr. Gillen's conviction should be reversed for two reasons. Number one, the Mr. Gillen was promised by law enforcement agents during the course of their investigation that he would be conferred immunity in exchange for his cooperation in this matter. At the very least, the conversations and the promises that were made to Mr. Gillen during the course of those interviews, some of which have actually been recorded and transcribed. He was informed very clearly that nothing you said could that you could, quote, speak freely at this point. So at the very least, and this sort of relates to our second point, the statements were involuntarily given because they were given in exchange or in reliance on that statement that he could speak freely during the course of those interviews. Now, the government has advanced the position below that the agent simply did not have the authority to actually confer immunity. That, I think, is belied by the record and is also contrary to the position that the government took in the court below. During trial at one point, this issue of immunity had been litigated extensively pre-trial during the course of a suppression hearing. But actually, when the case agent, Agent Nassloff, testified during trial to the nature of the cooperation, rather damagingly, against Mr. Gillen, what happened was that defense counsel renewed his motion at that point. And advanced the argument because it had emerged that the reason Mr. Gillen had been deactivated as a CI, effectively, was because he was no longer providing information. And that was critical to what he was being immunized for. He was being immunized to help infiltrate the organization so that he could provide information in exchange for his cooperation. And the government took the position below that, well, the agents don't have the authority. But then, when pressed by the district court, well, what if he had actually done anything that was specified in the CSA? Would he have received immunity, for example, conducting a controlled buy? And the government conceded below that, yes, he would have received immunity for conducting a controlled buy. But how was your client promised immunity for the statements he made in those initial encounters? I mean, I share the reading of the CSA that if he were to do a controlled buy, he's being told, we're not going to prosecute you for that. The DEA is, the agents are specifically authorizing that. But it reads somewhat differently with regard to past statements. And it says, I understand that I may be prosecuted for any unlawful conduct that I may have committed in the past. So how do you draw the statements he made to the agents and to the scope of an immunity prompt? Sure, well, I mean, to your point, your honor, that would certainly go to the statements that he made after the CSA was signed, and there were a significant number of statements. I think the government, in their brief, only referenced the three meetings on March 10th, March 12th, and March 18th. The 12th and the 18th have been provided in transcript. But there were a number of other meetings, all of which was presented at trial, very damaging testimony. And in fact- The district court found that there were no promises made, right? How is that clearly erroneous, that finding? It's clearly erroneous, your honor, because first off, I think a close analysis of the recordings. And I mean, I recognize that the transcripts are somewhat lengthy. It's a 54 minute recording on the first one, and an hour and 24 minutes on the second one, in which they discuss a number of things, including tactics. But I think, taken in its totality, I think that that finding by the district court is clearly erroneous. Because they did tell him, for example, you're not going to do jail. They did tell him that anything you say, in fact, on the recording, you can clearly hear this. Immediately after affixing his signature to the CSA, they tell him at that point, you can speak freely now. And then they bring their boss in, the DEA agents bring their boss in, who then gets into the car and also further elaborates. And I would also point out, your honor, and this was also argued below, there's no integration clause in that agreement. There's no- The magistrate judge found that the officers were basically saying we have no present intent to arrest you. You're free to go. I don't know how that becomes a promise never to prosecute. So they did say to him, your honor, that, and I think it's reproduced at beginning on page 43 of our brief, a number of sort of the back and forth, but they did tell him- Detective Harrington says that they could not and would not make any promises of immunity because it would be wrong. So that, your honor, was a statement that was made about 30 minutes into the conversation on the 18th, after there had been an extensive 54 minute conversation on the 10th. Sorry, the 12th, and then they were discussing. I mean, they show him the CS agreement about eight minutes into the recording, and he only signs it about 30, 35 minutes in. And I mean- Well, I mean, there may be some statements in there that support the claim, but the point is that there are lots of statements that go the other way, you have the written agreement. How is it clearly erroneous for the district court to find as it did? Because I think that the totality of the circumstances, and as your honor pointed out, there are a number of statements that go his way. And given the circumstances of how he came to be in this conversation with the government, given how this had all begun, sort of the genesis of this being a car stop at 1 o'clock in the morning with no probable cause of, or no violation of vehicle and traffic law at that point, bringing it back to the precinct while handcuffed. And I know there was some issue with that at the suppression hearing, but the government conceded in their affirmation in opposition to the motion to suppress that Mr. Gillen was, in fact, handcuffed in the back of the police car. But the point is that, your honor, to get to your question, I think that the on balance in the totality of the circumstances, for lack of a better term, they laid it on really, really thick. And they really convinced him. And while the magistrate found that Mr. Gillen was highly intelligent and experienced, at the end of the day, I mean, that cuts both ways. In fact, I think that cuts in favor of Mr. Gillen, because if he was duped into doing this with an agreement in which they said you can speak freely now after you've executed this, we're not trying to, I think they used the word jerk around with you, I mean, they really laid it on thick. And effectively, that was able to induce him to make the statements that he made. Well, ultimately, he skipped anyway, and so even assuming there was a promise, why wouldn't all bets be off? So two things for that. Number one, the government never, in the agreement that they used, they never outlined what happens if you zip out on us. That was number one. Number two is, there was a factual dispute below, which was actually raised in defense counsel's post-trial motion, that there was never any judicial determination that Mr. Gillen actually didn't disappear on these agents. I mean, he was living, I think, in Niagara Falls. He wasn't living in New York City. He was, the government could find him. I mean, effectively, what they said was that their efforts to locate him was that they left a message on his mother's voicemail. I mean, who didn't know how to respond to voicemails. And he was living with his mother. They had no difficulty locating Mr. Gillen at all. I mean, the government with all its resources could certainly have found Mr. Gillen. I noticed that I'm out of time. Thank you, Your Honor. Ms. Kessler? Thank you, Your Honors. May it please the court, my name is Sarah Kessler, and I'm the attorney for Herman and Geer. And I want to thank you for permitting me to appear remotely before Your Honors this morning. Your Honors, my client, Herman and Geer, is serving a life sentence after being convicted of continuing criminal enterprise and drug conspiracy count, a mandatory life sentence. When we as a society subject one of our members to this harsh punishment, indeed the harshest after death, we need to ensure that that convictment is obtained without reversible error. In this case, the district court committed reversible error in opposing this penalty in three critical respects. First, the court erred in failing to instruct the jury that it was required to make it special factors findings on the CCE count beyond a reasonable doubt, creating the likelihood that he received a life sentence on a lesser standard. Second, there was insufficient evidence to convict him of the CCE count. And third, as the government has already impeded, the conviction on both the CCE count and the narcotics count constitutes double jeopardy. Your Honors, I hear a lot of feedback on this line, but I'm going to assume that you can hear me. Yes, we can hear you. Let me ask about your first argument, the special factors. The district court did repeatedly instruct the jury that both the counts and the elements had to be shown beyond a reasonable doubt. And there was a reference on the voting sheet to the beyond a reasonable doubt standard on the page right before the special factors are listed. I mean, why shouldn't we look at that and say, read in context, even if there is not a specific instruction as to the special factors, the only instruction, the only standard the jury was ever given is beyond a reasonable doubt. So there's no reason to, looking at the instructions as a whole, to do anything but conclude that they were adequately instructed. Your Honor, what I would say about that is that it's not sufficient to just use the words reasonable doubt 20, 30, even 100 times in the course of the charge. If it's only being used in respect to those elements, I mean, I would argue that the more times it's used and never used in connection with the special factors sets the special factors apart. And I think particularly here, when these are special findings that expose a person to a life sentence, that convert a mandatory 25 years. The district court, when instructing about the special factors, did not say there's a different standard that applies. It didn't say for this you only need to find a preponderance. I mean, why would the jury think there was any other standard to apply? Well, the jury was required to meet, in my mind, the jury was required to meet that standard for the five elements. That was a threshold. Once it reached the reasonable doubt standard, the first five elements, everything else was listed yes or no. Yes or no without reference to any standard. So it is, without instruction, necessarily a weaker standard. There was just no instruction on how to treat those factors. And it's very dangerous here, and the effect on my client's case is very real. Because of the serious change in exposure from one to the other. This is a situation where clarity is needed. Not instructing with respect to these factors is a failure to instruct. And it's a failure to instruct with respect to an essential element. And as this court knows, that kind of failure, it constitutes plain error, even without objection. This court has held that in United States v Giovino, and United States v Masse, right? There was a failure in these instructions in leaving that connection out. Now, your honors, do your honors have any other questions with respect to that? Could you comment on the sufficiency of the evidence argument and address it for just a few moments? Yes, I would be happy to. And here, I'll focus my argument on the fact that the government did not prove, and no reasonable jury could be found beyond a reasonable doubt that Ms. During- Uh-oh. Uh-oh. She's here too. I'm in a- Could you repeat what you said? We lost you for a- Yeah, I just stopped my video. Does that make it easier to hear? Yes, we can now hear you. I think you should go back for a, repeat what you said there. We just lost about 20 seconds. Sure. What I said is that I'll focus my argument on the error in upholding the conviction when the government did not prove beyond a reasonable doubt that Mr. Aguirre supervised at least five individuals, and that here, based on the evidence the government presented, no reasonable jury could have found beyond a reasonable doubt that Mr. Aguirre supervised more than four people. What I argue is that it's certainly three people, arguably four, but even if we give them four, the other people in this case, there was no proof that they were either part of the drug conspiracy or supervisees of my client. Margaret and Juan Bonuelos testified for the government about the money laundering conspiracy. Mr. Bonuelos never even knew it was a conspiracy, and Ms. Bonuelos never knew it had anything to do about drugs. So because they testified for themselves, there's no inference that the jury could have made about their knowledge regarding a drug conspiracy. They testified, and that was what they knew. With respect to Mr. Gill, everyone but Mr. Gill testified that he was the boss, that he was the big boss. But didn't Gill himself testify that he was supervised by your client? And why isn't the jury entitled to decide what testimony to credit? Well, we have five witnesses that testify that he was not supervised, and one who is the one-person self-serving testimony that he was. Based on that balance of five to one, I don't think it was a reasonable inference for a jury to make. And then we have Williams, Lucas, and Guillaume, and these are people who are clearly customers. Mr. Gill refers to them as customers when he testifies about his relationship with them. As this court explained in U.S. v. Hawkins, the critical inquiry is whether the evidence in totality suffices to permit a jury to find beyond a reasonable doubt that it was not merely a buyer-seller relationship. And I submit, based on the evidence here, based on the testimony of these witnesses, Mr. Gill's testimony, Mr. Williams' testimony, even Mr. Lucas' testimony, they were buying drugs to sell as part of their organization in New York. They were not a part of the DTO in California. Thank you, Ms. Pensler. We'll hear from the government. Thank you. Good morning, Your Honors, and may it please the Court. My name is Sean Eldridge. I'm an Assistant United States Attorney for the Western District of New York, and I represent the government on this appeal. The judgments below should be affirmed, and if it's okay with the Court, I'm going to start just by addressing the arguments that were made unless the panel would like to address something else. You're conceding we should remand as to the one issue? Yes, Your Honor. Jeopardy. Yes. Which count will be dismissed? How is that going to be determined? So a couple of points on that, Your Honor. In terms of the first part is the Court should affirm the CCE count, which then would result, we submit, in the dismissal of the lesser included offense, which is the 846 drug conspiracy. Haven't we left that to the District Court's discretion in our earlier case law? Well, what this Court did, Your Honor, I would suggest in Rosario and in Miller, which are cases that both presented similar scenarios where a defendant had been convicted of both the CCE count and the 846 count, and in both of those decisions, this Court very succinctly, dare I say tersely, directed the District Court to dismiss the lesser included offense. So, yes, there's an element of, dare I say, belts and suspenders here in terms of if this Court felt there was a problem with the CCE count, which we submit there is not, that would require its reversal, yes, we would have the 846 to fall back on. But the lesser included offense, I think, consistent with what this Court did in Rosario and Miller, is the count that should be vacated. To my friend's arguments regarding Mr. Gillen, I think the Court has already hit on what I would suggest are the key points. As Your Honor, Chief Judge Livingston pointed out, conducting a control buy in the future is very different than what we're talking about here, and clearly for a bunch of reasons. The agents would have specifically authorized that, and frankly, you would have an official authority type defense. But the issue here is what did that agreement say, both in its written format, which the District Court clearly and correctly found it did not confer immunity, and it makes that very clear, but the District Court heard the testimony of officers involved, including at least one of the officers on the recording, and frankly, from the defendant himself, and then made a factual determination as to what it meant, what everybody understood, that there were no promises made here that would overcome the will of the defendant in making those later concessions, and in any event, he was also Mirandized. We don't disagree. My friend pointed out that we conceded that the defendant was handcuffed during that first encounter, and that's right, but what the record also shows is that he was handcuffed, the defendant, because he requested to be. He made requests to say, essentially, let's make this look not like I'm cooperating, but make it look like I'm being taken in and was handcuffed, and in any event, the agent still Mirandized him, again, being overly cautious, and frankly, the court's holding in that regard is completely consistent with this court's decision in Hack, which, just by coincidence, is also a decision that came from the same, originated from the same district judge. I'm sorry, Your Honor. Would it matter whether he was Mirandized if he were to prevail on the point that he was promised immunity and lulled into speaking? Would it matter if you were to disagree and say that he was lulled into and he was promised immunity? The fact that he was Mirandized, I don't think, would help the government's position. Your Honor, I think it is an additional factor for the court to look at in supporting. The voluntariness. Precisely. That's precisely correct. Right. Under the voluntariness, the Hack analysis, the first step is, basically, was there coercive conduct, and then we look at the three factors under Hack. Remembering the district court assessment of the evidence correctly, the district court and the magistrate judge assumed that he was not in custody in that first encounter when the car was stopped. I believe that is correct, Your Honor. I mean, I'm not sure that this is ultimately determinative of the issue before us, but I have some problems with that. He was stopped and then removed to the police station. He was told repeatedly, according to the factual findings of the court, that he was not under arrest, but I couldn't find where he was ever told that he was free to leave. And generally speaking, when you move a detainee from the place they're stopped, we say that ripens into something more intrusive than a stop. So two responses to that, Your Honor. I think that is, on the first part, of course, we're, again, looking at the totality of the circumstances, and that's why all these other things that we've started to discuss, including how the encounter took place, the fact that the defendant himself asked to be handcuffed. The district court, as I recall, then went on to discuss, even if there was potentially a problem with the March 10th encounter, which it found there was not, that then the later encounters, the March 12th and the March 18th encounters, were sufficiently attenuated, both in terms of passage of time, and I think more importantly, or at least equally importantly, was the fact that it was the defendant who was the person who had reached out to the agents to set up the meeting, who decided where the meeting was going to be, right, in those factors there. So even if there were a problem with the March 10th encounter, which we don't think there was, and the district court found there wasn't, we have the second part on attenuation. I'll turn to the Aguirre arguments in terms of the beyond a reasonable doubt argument on the factors. I think the court has already hit on the points that I would emphasize and make, which is the key here is there is only one standard of proof that this jury ever heard about, beyond a reasonable doubt. From the beginning of the trial, they were told the government has to prove things beyond a reasonable doubt. It's over and over in the instructions. Yes, are there some portions where Judge Villardo again says beyond a reasonable doubt before reciting certain factors? Undoubtedly. But there is zero dispute that there's any other standard that is ever introduced into this case at any time. But the jury is never specifically instructed as to the standard that applies to the special factors. So as I remember the jury instructions, Your Honor, right before Judge Villardo reads the special factors, he's talking about the five elements of the CCE and again says that the government's standard of proof is beyond a reasonable doubt. It is absolutely true that he doesn't say it again in connection with those other two factors. But reading the instructions as a whole, as this court must, there's no other conclusion to be reached. And the final thing I would say about that is the jury form right at the top, this is A309 of the defendant's appendix, says make your findings beyond a reasonable doubt. That is the only standard that is ever introduced to the jury. So maybe we as, dare I say, legal nerds or at least legal tacticians think about, you know, different standards of proof and where they might apply and standards of review. The only thing this jury was ever told over and over and over again is the bedrock principle of our jury system, which is beyond a reasonable doubt. Can I ask a question about the sufficiency of the evidence as to the five supervisees? Yes, Your Honor. The jury was instructed that they needed to unanimously agree as to the five, but I couldn't find anything in the record that identified the five that the jury found. So I don't believe they were asked to name those five to the district court. Am I right about that? You are correct, Your Honor. Okay, so does that mean given that this is an argument as to the sufficiency of evidence with regard to a whole group of people, if we were to determine that the evidence was insufficient as to one of those people, would that essentially vitiate the jury's finding? I think if I understand Your Honor's question correctly, I think it's the converse of what Your Honor is positing. And before I go into that, I have to, again, say this to remind the court, as we put in our briefs, we're here on plain error review for this. This is not an issue that was addressed below. The defense agreed to the instructions here and, excuse me, did not raise any argument below about the five people. Was there an instruction that they had to unanimously agree on the five? Yes, Your Honor. They were told specifically that they had to unanimously agree on the five, and in other contexts they had to unanimously agree on, for example, the three offenses that constitute the CCE. And I remember specifically in that one, they were read kind of back to back, and I recall Judge Villardo even saying, you know, six of you can't say one and six of you can't say the other. To answer Chief Judge Livingston, your question, if the court were to determine that there was one person that was not a supervisee, I think the converse is the correct way to look at it, which is the defendant appellant has already conceded that there's at least three or four, three in the main brief, four in the reply brief, and that's Sonia Hernandez, Martha Aguirre, Roberto Tennis, and then in the reply brief, Juan Alfaro. So then we have to find one more that is, again, reviewing the sufficiency of the evidence and the light most favorable to the government. Your Honor pointed out one, Mr. Gill. Could there be competing inferences to be drawn? Sure, and those are great arguments for the jury, but in terms of the sufficiency of the evidence, the record testimony is that Mr. Gill testified that Aguirre, his role was to be the boss of the money and everything, and that he oversaw, that is, Mr. Aguirre, the delivery of cocaine shipments, including one for 100 kilograms. We can go on through a whole bunch of them, others, Daryl Williams, Margaret Benuelos, Juan Benuelos, but another very easy one on sufficiency review is Maulana Lucas, who testified, quote, I answered to Lucky, and it's undisputed that Lucky is Mr. Aguirre. She referred to him as the boss. Mr. Aguirre instructed Lucas to pick up pallets of drugs and drug proceeds, told him where to find them, where to deliver them, and after some drugs went missing, Aguirre told Lucas, if you don't have the $55,000, you have two choices, work it off or I'll kill you. So in terms of sufficiency of the evidence review, there is more than enough evidence to find at least five people, and I'd submit probably ten. I think, you know, in terms of Mr. Gill, I think it's a little ironic, too, as I understood the defense argument was essentially just now what the court heard was don't believe Mr. Gill when he says that he's the boss, but believe Mr. Gill when he says that these other people the government says are supervisees are being sellers. That's not the way this court's review for sufficiency of the evidence works. It's not the standard. It's in the light most favorable to the government drawing any reasonable inferences, and there's more than sufficient evidence. Unless the court has any further questions, we ask you to affirm. Thank you very much. Excuse me. Affirm with the exception of after you affirm the CCE count to instruct the district court to dismiss the 846 drug conspiracy. Thank you. We'll hear Rebecca. Thank you, Your Honor. I would just like to point out that in the CSA agreement, which the government sort of holds up as being dispositive over here, as disabusing Mr. Gill of any notion of immunity, it clearly says that I have no, I understand that I have no immunity or protection from investigation, arrest, or prosecution for anything that I say or do except for activities specifically authorized by my controlling investigator pursuant to my cooperation with the DEA. And then referring to the court back up to section one, paragraph three, one of those is the infiltration of a drug trafficking organization. And so while the district court during trial when the motion to renew was made specifically used the example above that, which is section one, paragraph one, a controlled purchase, the infiltration of a drug trafficking organization was the one that we were proceeding under. And, in fact, if you listen to the recording and you read that transcript, the agent goes through the list, and he says, well, controlled buys, you're not going to do. The introduction of undercover agents, you're not going to do. But, ah, the infiltration of a drug trap, that is you because you're providing us information. And part and parcel with doing that is providing the government with baseline information about how the organization works in order to be able to do that. And that was the critical evidence that was introduced against Mr. Gill in that trial erroneously I submit. As it relates to the hack decision, I know that the district court placed a lot of reliance on hack, particularly since it came out of that very same courtroom. Hack is very distinguishable from this case for a number of reasons. Number one, one of the factors that this court looked at in hack, in reversing the district court there, was that hack came into the precinct voluntarily, which, as Your Honor pointed out, that was not the case here with Mr. Gillen. The government- Well, the subsequent meetings were arranged- Yes. By your client at a location of his choice. Well, actually, Your Honor, the record doesn't really support that. The March 12th meeting, as the evidence establishes, was that my client went to the precinct to go pick up his car because his car had been vouchered involuntarily, I submit, against his will. And he goes to the precinct, and that's when TFO Harrington, the second officer involved in the meeting, says, Hey, Troy, reach out to us. And it's at that point that he sort of reaches out to the agents. But the point is, is that there were enough damaging information that was elicited in the first meeting to the point where the cat's out of the bag at that point. And so I think the court relying on an attenuation theory at that point is really in error. And I know I'm out of time. Thank you, Your Honor. Thank you. Ms. Kunstler? Thank you. I'll try with video. We can see if it works. Your Honors, I'm just going to speak to the one issue in terms of where discretion should lie with respect to the double jeopardy issue. And I submit, the job, it is not the job of this court to substitute its discretion for the discretion of the district court. That is what the United States Supreme Court held in all of the United States, in which it held in a double jeopardy context that the only remedy consistent with congressional intent is for the district court, where the sentencing responsibility resides, to execute its discretion to vacate one of the underlying convictions. That is what this court has done in a number of cases, including U.S. v. Goodwin, U.S. v. Palooza, which I cite in my brief. The fact that the government has some stipends for cases in which this court does not do that does not mean that it's not what Bald requires. This is, the district court is the court that heard the evidence in this case. This court says over and over and over again that, you know, that it defers to the discretion of the district court. And per Bald v. U.S., this is one of those situations where this court should indeed defer to the district court's discretion. Thank you, and we will take the matter under advisement. Thank you all for your arguments. Well argued.